Thank you, Your Honor. May it please the Court, I am Jim McLaughlin, and I represent Mr. Ivey. With me is Alexis Narducci. First, we would like to discuss the show-up question here. And what's important about the show-up is that virtually all federal appellate courts, including this one, have criticized show-ups on a variety of grounds, most predominantly because they are suggestive and therefore generally unreliable. But there are very, very few cases in which the courts have granted relief with respect to a show-up, because there are a variety of factors that they look at and they find the totality of the circumstances it's simply not either sufficiently subjective or there are other indicia of reliability. The question is, is this a case in which we are on the other side of the line? And we would respectfully suggest that we are, because of a couple of very, very specific factors in that totality of the circumstances. In the general context, however, I would first like to note that if one is constantly saying you should not be doing this, but actually never say you were wrong to do it, one cannot be surprised if that behavior which you are trying to deter continues. That is a problem with show-up identifications. What is different here is several factors. Most trenchantly, the detective who did the investigation's conduct, that detective told each of the 14 people who came for a show-up that Mr. Ivey looked like the suspect. And he, in fact, had been captured. That direct statement to influence the outcome... Well, just to be clear, she said that he fit the description of the suspect, right? Yes. Not looked like. Well, he fit the description. If the officer has told you he fits the description, then naturally, the overwhelming suggestiveness, when the man is standing there in front of the position... Now, if the cop car and handcuffs, then the suggestion is... Exactly. Right, he does fit the description. That must be why he's in a cop car with handcuffs. And that's why my natural answer is, sure, that's him. It looks like him. Ironically enough, the one witness who testified at the trial, but like both witnesses, was not asked to identify Mr. Ivey at trial, simply said in response, apparently, that he looked like the guy. Didn't say that was the guy, in essence, parroting Detective Hopkins. The second factor here, I think, is almost more disturbing. And that is, Detective Hopkins in her testimony made quite clear that she had the ability to record her discussions with each of those who was to identify, or attempted to identify Mr. Ivey, and could have recorded the actual identification process. Instead, she made the decision, and we respectfully suggest it was a knowing decision, in light of the guidance of the courts, not to record any of her communications with the person doing the identification prior to them actually looking at Mr. Ivey. She did not record any of their comments with respect to Mr. Ivey, or the time it took to identify him, or how certain they were, or anything else. After the identification process, she put the person back in the car, and then asked them the simple, pointed question, did you identify him? Why is this critical? It is critical because you have a police enterprise here taking all of the factors that you would consider, you know, how certain they were, what prior description had they given, what other comments did they make, and taking affirmative action to make sure that information was unavailable to you. Those two factors, in and of themselves, the first and second, are sufficient. However, if you look at the reliability issue, in addition to the suggestiveness, you also have these factors. You have a room, or an interior, that was, quote, extremely dark, as defined by the first police officer on the scene. Indeed, it was so dark that he did not see the body of the victim on the floor and tripped over it. The evidence with respect to this bar is, in addition to being extremely dark, it had strobe lights and a variety of other things that would interfere with an individual's ability to identify the assailants who, in  So there is an What do you say to, Mr. Johnson said he stood in the bar area, which is well lit, because there is a cash register. I think maybe the entrance, there were two areas that were well lit. What do you think about that? I think the definition of well lit under these circumstances is open to question. The second thing is, when one is moving rapidly across areas that are not lit and lit, the issue that was identified, which the expert who was excluded would have testified and actually was commented on in the court is, it is not merely about the lighting. It is your eyes adjusting to the lighting. You come from a lit area. You go into a dark area. You can't see. You come in from a very dark area into a very light area. Again, your eyes have to adjust because everything is bright and it is difficult to see. And so when you look at the totality of the lighting in the circumstances, the mere fact that there was a particular part that was well lit and one of the assailants may have been in that part for a relatively brief period of time, I think does not overwhelm all of the other factors. And again, the totality is not sufficient to make the identifications reliable. So the district court used the fact that the vast majority of the people that were taken to the show-up did not identify appellant. The district court used that to say that it is some proof that it wasn't a suggestive show-up. What is your response to that logic? I think that is a remarkable exercise in self-justification. There is no scientific or other evidence that would indicate that because 85% of the people cannot do an identification, the two who did identify in response to a suggestive show-up are reliable. In fact, it should be exactly the opposite. That the two who did identify the assailant were in fact influenced by the suggestiveness and the other 14 simply held on. Particularly where here you have, for example, the woman witness who testified to a variety of different descriptions and a variety of different factual circumstances to justify her identification. And again, the male witness who simply said, well, he looks like the guy. How should we weigh that? Because you are right, their testimony was not, it wasn't overwhelming, right? He said, I'm 15 feet away when you asked me to identify him, it wasn't overwhelming. And then she said, you know, left side, right side. But that was all in front of the jury, right? So the jury heard that and they were cross-examined on doesn't that make you kind of why should we trust your iffy testimony on that? How does that weigh into how we analyze this question? I think the fundamental answer is found in the analogy to the rules of evidence. And that is, yes, a jury can weigh lots of different factors and the jury may or may not be qualified or not to do that, particularly when, as here, there are a variety of psychological factors and observational factors that science identified that a juror would not be familiar with. But nonetheless, the courts with the rules of evidence in here say, it is so, you know, 403, it is so prejudicial, unfairly prejudicial, this is so unfairly unreliable that, therefore, the court's obligation is to put an end to the practice. The other problem, again, is a la the exclusionary rule, if you want to deter people from going as far as they did here, that's it. The other thing is the jury didn't know or couldn't understand the impact of the detective not recording or making any record of all of the other factors I've discussed where, in essence, they have cut off judicial review. That has an independent significance a jury could not appreciate. The other things we have here, I think... Assuming this was error, why is it not harmless error, considering all of the other evidence against appellant, particularly with respect to the robbery? Two factors, Your Honor. First is that the statistical evidence and the scientific review show that the testimony of an eyewitness is generally deemed by a juror to be more persuasive than a variety of other factors. And so that would create, you take those identifications out of this case, and you have a very, very different case in front of the jury. The only thing you have then is, well, there was a card, which we're separately going to talk about, that may have connected Mr. Ivey to the crime, and you have the issue of he was in the truck when it was found, when it was identified. And so... Wasn't there also DNA? Your Honor? Wasn't there additional evidence other than him just falling out of the truck? The question was whether he was in the truck. There was no DNA evidence that I recall that would have identified him as being in the building. I may be wrong, but I don't think so. I think it's just connecting him to the vehicle. To the clothing that was in the vehicle? To the clothing that was in the vehicle. That witnesses described... To the hoodie that was in the vehicle? That's right, Your Honor. And didn't witnesses describe the offenders as wearing a hoodie? One of them, yes. But a hoodie is very common... And then there was the money, too, right? I don't believe... Was there cash found? Yes, there was $186. A lot of it in ones. In ones and 20s. And this was a strip club that was robbed, correct? It was. But I... What... He was charged with the robbery, but also... Convicted, but also the murder... Well, the use of a firearm that resulted in death. Was there any evidence that he had... That that gun was his? No, they didn't find a gun, Your Honor, and so there is, in fact, no evidence. And, you know, it is purely a circumstantial case there with respect to, well, there was a card that was on Mr. Youngblood, and so therefore there's some connection there. And you have Mr. Bishop who pleaded... Oh, it's a card. And so there is, as Your Honor has rightly identified, there is a tremendous dearth of information, of evidence, that would beyond a reasonable doubt connect him... Code defendant testified against him. Pled guilty and testified against him and said he did it. Yes, Your Honor. If you look at, you know, Mabine and Hancock, the two recent decisions on show-ups, I think, and you go through those factors, this case, again, is the extraordinary case where you have that. And I want to just, mindful of time, the fact that the court excluded the expert here simply exacerbates the problem. Where in that district they've been using identification experts since at least 1996, and that would be the Maddox case in which they had an expert. And there are literally hundreds of cases in which they are identified as experts and used. Dr. Michael? Yes, Your Honor. Didn't the defense tell the district court three times that they'd elected not to present Dr. Michael as an expert? Yes, and the answer to that, Your Honor, is that is not a waiver because at that point the court had ruled and had made the remarkably prejudicial statements he made about Mr. Michael just being somebody who got paid to say witnesses were not reliable. At that point, once the court had ruled, the fact that counsel said At that point you say we are not calling Dr. Michael because the court has ruled, but we continue to preserve our objection to that. Yes, Your Honor. That's not what happened, correct? He simply said we are not doing that. I think a reasonable counsel would say he had already made his record. Judge Conbern said in response, are you sure? Because if you're not withdrawing him, we need to make a record. The judge drew attention to this problem and said if you're not withdrawing, we need to have a record, I need to make some rulings. And they said no, we're withdrawing. I think in light of the judge's prior conduct, they could make the reasonable determination that they had already made enough of a record, Your Honor. The next issue is the Miranda issue. And here I think the most important fact is the persistence of the officers and the fact that no Miranda warning so far as we know was given the entire time that he was in the location of over four hours. You have the Detective Cuneus saying, do you need a medic? Answer, no. If you're going to talk about a well-being exception, or do we need to provide care, at that point it is complete. However, he then goes on to ask about Ivy being in the truck. That then is not enough because Officer Secundi then comes in minutes later and asks these questions again. And so those questions and that dialogue creates the issue of the violation of Miranda without an exception that reasonably justifies the continued questioning over this issue. And having reserved time, I will discuss it in much more depth. I'll use my reserved time for the issue of the question under violent force here and whether we have a 924C issue. Thank you. Ms. McLaughlin. Ms. Ray. May it please the Court, Amy Ray for the United States. I'll begin with the show-up identification. And since that's where Mr. McLaughlin began, I would say two things. First of all, you have to have suggestive procedures, and you also have to have a substantial risk of misidentification. Supreme Court has said evidence is for the jury to weigh unless there is a very substantial likelihood of misidentification. And there have been almost no cases that I could find where this Court or the Supreme Court have held that the due process right was violated because of the substantial risk of misidentification. In this case, the witnesses were all told, it's just as important for you to tell us if this is not the person as it is if it is the person. And that might be why this person fits the description. This person that we're taking out of the police car in handcuffs fits the description. Right. And given that, nothing, these other things that the officer says she said, was that recorded? It wasn't, but, of course, that doesn't go to whether or not the evidence that's actually here. It doesn't render a procedure unreasonable simply because it was not recorded. And what she testified to, and there's no contrary testimony, that she told each one of them, yes, he matches the description, but he might not be the person. And it's really important for you to say if he's not. Is that what she, I don't remember seeing, and it is really important for you to say that he is not. I remember her testifying that she told him he could be, could not be. She told him it was just as important for them. I remember the just as important. I don't remember. I believe she did, Your Honor, and I can look to see quickly if I can locate the page number in the appendix. She testified a couple times. She testified both during the suppression hearing and during the trial, and I believe it was in the suppression hearing where she. What is your best case, I'm sorry, I'll find the testimony. What is your best case that this was not suggestive, improperly suggestive? It's not, I would say that I haven't found a case that said that a show-up identification where somebody was, you know, handcuffed or whatever. Those identifications that take place immediately following the crime are the ones that are, that are both on the one hand suggestive because you have only one person. Two or four hours after, right? That's right. Immediately following. That's pretty close in time, Your Honor. Within two or four hours is pretty close in terms of, and one of the things that the courts have said is it's important in a case when you need to find the culprit if this is not the person. The officers thought they had the culprit here. They were trying to confirm that this is the culprit. That's why they told the witness, the potential witnesses, this person fits the description. They're not looking for, they think they found the culprit. They think they found the culprit, but they would need to make sure because if they don't, they need to release Mr. Ivey if they didn't find him. Now, I will say that there's ample evidence that it was Mr. Ivey, even beyond the evidence that this court has discussed so far. So even if, and let me just say two things. First of all, I would refer this court to the case of United States v. Saunders, 2007, Judge Michael, who held that, who said that the procedure in that case was suggestive, but that it was still admissible evidence, the exclusionary rule should not apply because it was not so suggestive that there was a substantial risk of misidentification. And the Supreme Court, one of the great quotes that I think is very helpful, is juries are not so susceptible that they cannot intelligently weigh identification testimony that has some questionable feature. The question is, do you take this away from the jury, this identification? This defendant had lots of opportunity to cross-examine extensively, and they did. Judge Cogburn characterized this identification testimony as some of the weakest that the government had. So let's talk about what the government had that was strong. In addition to the fact that they found the Big Mike's phone in the truck, they found the wallet of Randy Hamilton, and Randy Hamilton testified that he was in Club Nicky's and that that was his wallet. It was on the floorboard of the truck. They found DNA in the truck that was associated with Mr. Ivy. Both Michael Johnson and Brittany Simmons testified, and also Randy Hamilton, that there were two people they got robbed by. One was a much bigger gentleman, and one was smaller, and that it was the smaller person who shot Adrian Youngblood. And of the two people that were in that truck, one of whom was Ivy, who was jumping out of the truck, he was the smaller of the two. And there was a clear disparity. It wasn't close. So we have, and I want to mention, because I didn't do this in my brief and I should have, FBI agent Imel, I believe is his name, he did an assessment of all of the clothing that was seized from DeMarcus Ivy. And when he showed the video, he compared specific identifiers on Ivy's clothing and on Kevin Bishop's clothing, and he compared it to the video that was taken, the surveillance video, in Club Nicky's. So there is evidence tying the clothes that DeMarcus Ivy was wearing with the person who was walking through Club Nicky's. It was much stronger than just some ambivalent or slightly, I would say, yes, eyewitness testimony can be very powerful. I would also respectfully suggest that this eyewitness testimony was not so powerful. So at the end of the day, were the suggested procedures so significantly risking of misidentification that we should take that from the jury? And I would suggest that if you read the cases, you can't reach that conclusion in this case. Not based on the fact that all of the witnesses were told they could, and 12 of the 14 didn't identify him. And the lighting, by the way, just to correct that, Michael Johnson testified that the lighting in that lobby area, when he was told, let me in or I will kill you, he said, I was two feet from him and I could see his face. I was two feet from him and looking him in the face. Ms. Ray, as you properly cited Saunders' case in 07, Judge Michael, and then you moved along with the other part of homelessness and other indicia of the crime beyond the identification. But let's take this first part. Here, one of the things that keep it from being suggested is that you get as much as you can of a description from the eyewitnesses or the people who are in the club first so you get an idea of who they perceive, what they perceive. But we don't have any of that because for some reason it's not on the record, really, what they were told or what they told them. But we do know they said he fits the description. And then you show them a person who's in the patrol car, handcuffed. That's pretty suggestive on steroids, isn't it? I would say it is suggestive, but I don't think it's so suggestive that it was substantially likely to lead to a misidentification when every witness was said, it's important, if it is not the person, then tell us that. And that description came from the people in, it was, Brettany Simmons said she called 911. She gave a description. I don't know exactly what that description was. I don't think that is on the record. But what we do know is she gave a description. Michael Johnson also called 911, and he presumably gave a description. So they did have a description, and DeMarcus Ivey matched the description because we have lots of other evidence that he was also in Club Nicky's. So I'm not saying that this isn't suggestive, but there is, I mean, the Supreme Court has also recognized that there are times when suggestive show-up procedures are helpful. When you do have a crime like this, a murder, and you need to find the suspect, it may be okay, it may be better for them to go ahead and show this person so that he can be released if he's not the person and they can find the person that did it. But this is clearly not a case that he would have been released if someone said he doesn't look anything like him based on what you said you found in the car, would it? You know, Judge Gregory, I would say this. Because at that point, we didn't have the ability to connect. The only thing that I think they would have known at that time was that the hoodies generally matched, that there was Big Mike's phone because they were able to turn that on relatively quickly. But I don't know if they knew that Randy Hamilton, the wallet, connected them. I know they hadn't gone through the video procedure to see that. Twelve people did not identify him, and he was not released. Well, twelve people didn't identify him, which also goes to the point that how suggestive could it have been? If it was so suggestive, wouldn't more than two people have identified him? They didn't. So, and I think that what I'm saying about whether or not they would have released him is they certainly didn't have the quantum of evidence that we now have and that we can rely on for a harmless error argument. They only had some of it. Whether they would have released him or not, I do not know. But they certainly might have if nobody had identified him. They may have been forced to. Mr. McLaughlin makes a good point when he started off. He said, listen, you have a situation where we know this is a dangerous type of territory of suggestive, show-up identifications, but if you keep on having these cases where you never really enforce it, it never gets enforced because you come in and say, well, it was suggestive. But look what else we had. Look what we had here. But here, this case, I would say it's very suggestive. And then, of course, you have these other things that are there. Like you said, you didn't know you were going to have those. And then every case gets sort of better later on anyway. It sort of cover-up, not cover-up, but supports the other things because, like you said, you didn't have that. So later on, you say, well, look, we had this anyway, so then it's harmless. So we never really get to really give a fair assessment of the impact of suggestive because it's a moving target because your case, rightfully so, gets better and better and better and better and better. Well, or it gets worse. I mean, or it gets worse and they don't get prosecuted. It could go either way. But there are always cases where it gets better because otherwise, worse wouldn't be here. That's right. I understand. That's what jurisprudence can only face when it comes to us, and it's always when it wants to get better. And then you say, well, it may have been suggestive, but look what we had here. There's no harm, no foul. Is that a real way to protect the constitutional-type protection by using that formulaic-type reason to justify it? Your Honor, the Supreme Court has made very clear that due process is not implicated by a suggestive procedure. Due process is only implicated if there is a substantial risk of misidentification. And this procedure was not as suggestive, yet there were suggestive elements to it for sure. But you also had an officer who told each particular witness, don't identify him unless that's the person because if it's not the person, we need to know that. That makes it a lot less suggestive. Whatever you had, you weren't secure enough to go with your case at trial without those identifications. You had all those other things, the card, you had the money, you had the hood. You knew that you needed those identifications. I don't agree with that, Your Honor. Okay. No, I don't. And I will say this, what a trial attorney thinks they need and what I think they need may be two different things, and you'll probably appreciate that distinction. Right. But I will say that, you know, in... I didn't mean you. I meant the courts, the government. You're trying the case. Right. But I'm saying, no, I'm saying as the appellate chief, the appellate person who defends my colleagues' work in the trial court, I can regularly say you over-tried that case. You didn't need the evidence that I might be going up defending the admission for. In this case, we didn't need this identification evidence, and, in fact, I think that the defendant did quite a good job of attacking that on cross-examination, and that's part of why there's not a due process violation here. They had the fair opportunity to challenge the accuracy of that. I do want to briefly address the suggestion that Dr. Michael was somehow, and first of all, obviously, that issue, I'm sorry for saying I shouldn't say obviously, we believe that he waived the issue of the expert testimony. But I also want to note that he wasn't saying anything that all of us don't know. In cross-examination, we asked him, so what you're saying is that if it's dark, it's hard to see. If there's an obstruction, it's hard to see. If you're nervous, it may make your identification less reliable. Everything that he was going to testify to is something that jurors would know, and this court has been very discouraging of eyewitness expert testimony talking about eyewitness identification. This court's decision in Lespierre is one of those. I want to turn to, unless your honors have- His co-defendant testified that appellant here was the one that shot Mr. Youngblood, or no? His co-defendant did not testify. Right, well then who, what's the evidence that appellant shot Mr. Youngblood? Both Michael Johnson and, well, three witnesses who were present testified that the shorter of the two assailants shot him, but also he's guilty under- And two of those three were the ones involved in this show-up procedure, correct? Yeah, they had the best look at him, yes. Both of them saw him by the- And who was the third one? The third one was Randy Hamilton, who was sitting right next to Mr. Youngblood when he was shot. Was he also taken to the show-up procedure? Well, I assume. I don't have- There's no evidence in the record that he was taken, but I would presume that he was unless he left and- I don't- I suppose I should say I don't know. He didn't identify him, right? Right. But as the trial got better, his memory got better. No, what he testified to, your honor, was that the shorter of the two assailants. And that's what- I was trying to get that out. The shorter of the two assailants was the shooter. Okay, so he was not able to identify Mr. Ivey as the shooter other than the shorter of the two assailants was the shooter. He did not identify him at trial by vision. Was not asked to, correct? He was not asked to. And I don't know whether or not he was brought to the show-up identification. What I do know- Since he wasn't asked to identify him at trial, maybe that is some indication. I'm not- I wouldn't be surprised if he could not identify Mr. Ivey based on his face. What he knows is the shorter- Pardon me? Wasn't he standing right next to- He was sitting next- Okay, let me go back. If I could, just get a couple things out, Judge Thacker. First of all, there were two witnesses who- only two witnesses that we're aware of who saw Ivey DeMarcus under good lighting conditions. They were Brittany Simmons who was by the bar when he first came in by the cash register and there was light that was shining down. Michael Johnson saw him by the cash register and in the lobby. Randy Hamilton was in the dark part of the club the entire time. He was at the back initially and then Mr. DeMarcus brought him up to the front and put him on the floor next to Adrian Youngblood whom he shot. And what every witness testified to and what we know from the two people who were found in that truck is one was 5'8 or somewhere between 5'9, 5'10 and not particularly large and the other one was much larger and larger in every way. And so these were not close. How tall was he? You gave 5'8, 5'9, 10. I don't know his exact height. I mean I could look at the precedence report and tell you, but there was one- all the witnesses, every single one said there was a shorter one and there was a taller one. And I do know that Mr. Bishop was heavyset. So Mr. Bishop did not testify at trial. I assume then that somebody testified as to his height and weight at trial? I think there was some testimony by one of the officers who seized Mr. Bishop about his size. Because otherwise how do you know who's the shorter one? You can see it in the video, Your Honor. Okay, the video. You also have video surveillance that shows them both. Okay, can I go back to the- so there's Simmons and Johnson. Both of whom saw him in good lighting conditions. And those were the two that were taken to the car. There were 14 witnesses taken. I'm just focusing on the three. I'm trying to find out if there was sufficient evidence absent the identification to convict him of the murder, whether this was harmless or not. So I'm trying to just focus on those three. Those two were the ones that showed up at the- two of the 14 that were taken down there within the two to four hours afterwards. And those were the only two during that process that identified him. And then Hamilton did not identify him and wasn't asked to at trial. Correct. He wasn't asked to at trial and I don't- But he just said he's the shorter one. He did. He said the shorter one shot him. But to be clear, Mr. Ivey is guilty either way. Because there's an aiding and abetting and- I looked at that. There's- yeah. In the indictment- Pardon me? In the indictment there was an aiding and abetting? I don't know if it was in the indictment or not. But it was instructed on and nobody objected to it. And so it was absolutely- the jury was instructed that they could find on an aiding and abetting theory. I looked at it. But the evidence that it was Mr. Ivey was very strong. You also have federal- the agent who did the video assessment as an expert testimony was able to isolate which people were where. And he was able to isolate that the person who was wearing the clothing with the the night he was arrested, that he was the shooter. You could see it in the video that he was the one. And, you know, if you watch this video- and I see that my time is up. Oh, you're right. It was a shooting that happened as they were walking out the door and he turned around and shot him. So he was able to identify the- isolate which was which based on the clothing as well. So we had a lot of that evidence. Your Honor, I didn't get to address the Miranda issue. I would say that for- that whether or not the questions that were posed were did you get run over by a truck, did you get hit by the truck, and that those were not reasonably likely to solicit incriminating information. But even if it was, we had so much evidence that it was Mr. Ivey in the truck that that would be harmless. If Your Honors don't have any other questions, I'm trying to remember if there's anything else that I need to say, but I think that if Your Honors don't have any further questions, the other evidentiary issue I would also- Oh, I do want to address Mathis- Hobbs Act. Yes, Hobbs Act. Thank you. This Court's decision in Mathis holds that Hobbs Act robbery is a crime of violence, a completed Hobbs Act robbery. And Mr. McLaughlin's arguments contrary to that are simply challenging the legitimacy of Mathis. I mean, he doesn't make any particular argument other than based on Borden that you could commit it by recklessness, but you can't. Under Mathis's definition of Hobbs Act robbery, it can't be reckless because it requires a threatened use of physical force or actual force. So in light of this Court's decision in Mathis, it cannot be plain error because plain error requires a decision that shows that the decision was wrong, and Mathis shows exactly the opposite. If Your Honors don't have further questions, the government requests that this Court affirm the District Court. All right. Thank you.  Mr. McLaughlin. Thank you, Your Honor. First, I would note with respect to Ms. Simmons, she stated at various times, and it's in our brief with record sites, that the shorter gentleman's face was covered, implying she couldn't see it, that she had seen the left side of his face. Then she changed that. She testified that she was facing the door when the assailants entered. The video establishes that she wasn't. She was looking in the other direction. There are some significant issues with respect to the reliability of her testimony. If you eliminate those two, and of course we're beyond a reasonable doubt, the testimony you have is Mr. Hamilton saying, well, the smaller guy did it. That does not get you a conviction beyond a reasonable doubt anywhere. With the other two, I'm not entirely clear. Did they also testify with respect to the murder, with respect to the shooting, that the shorter of the two had the gun and shot the gun, or did they make a comparison like that? I don't recall, Your Honor, one way or the other. I don't recall that, but I can't reliably say that they didn't make reference to that. What I think is also relevant with respect to that question is with respect to the clothing and all of that, it was generically dark clothing. To the point that there was a connection between Mr. Ivey and the truck, I think without the question above, were you hit by the truck, you have really the connection is the issue of the DNA analysis, which simply put clothing in the general category of consistent with his DNA, not saying it was, which leaves open a variety of arguments available to the defense. And so you get to a place where the standard of beyond a reasonable doubt really comes into play in a much more significant way. I would like to address briefly the issue of the Hobbs Act, because the government is correct. We are saying quite simply that Mathis is wrong. And if you look at and understanding the procedural hurdles we have there. A panel, we can't reverse a panel to publish an opinion. Your Honor, I need to preserve the argument so that I can then seek a petition for a hearing on Bonk. The only thing you put in your brief is preserve, counsel. Yes, Your Honor. I would suggest in its decision this court could note that there are concerns about Mathis. Counsel, go ahead. I'm sorry for disturbing you. Go ahead. No, that's okay, Your Honor. Certainly. I appreciate the guidance. This court in its decision could say it has concerns about Mathis that would raise issues. I just want to make note of the recent decisions. So this decision, of course, decision in Malacu, 41F, 4386, where an injury to property can be committed without the use of force If you look at Hobbs Act robbery, it is fear of danger or damage to property. And most pertinently, we don't have to jump through a lot of theoretical hoops here because if you look at the cases that we cited in our brief across a variety of circuits, there are a host of cases where there is no credible argument that the defendant threatened force or used force or attempted to use force. But nonetheless, because of the fear component, the court said it was sufficient that the bank clerk or whoever it was felt fear and that is sufficient. And it's a very broad reading of the Hobbs Act robbery statute. Again, we've identified at least half a dozen cases in our brief. And our position is you cannot have it both ways. You cannot have such an expansive reading of the Hobbs Act robbery that once someone is just in fear simply because, for example, someone walks in the room and says put money in the bag with no threat, no evidence of a weapon, no effort or interest to commit violence and then call it a crime of violence where you have to have the use, threat, or attempted use of violent force. And those cases, very concrete cases, are completely inconsistent with the expansive view that you have. The other thing is the recent cases, particularly, I think, if you look at battle and if you look at Castleman and this issue of the directness and the use as an instrument of violence, whatever the extent of the violence is, you go back to the cases we cited in our brief and you don't have that. And so I think there is a legitimate argument there that the court here could recognize. Of course, you're referring, of course, to the categorical assessment of it, the crime. Exactly. We still have categorical. Lastly, I would just say on the issue of the show-up identification, your Honor's point that the case always gets better. I apologize. My time is up. Go ahead. You can finish your talk. Go ahead. So the government is correct. There just aren't cases where courts say no. And so you engaged in this post hoc analysis of okay, let's look for reliability. Let's look for something that's not suggestive. The notion that in the totality of the circumstances here, saying at the front end, you know, this person looks like the suspect and putting all that you have here, you know, man in handcuffs and the rest of it, that it's all forgiven because we said, well, it might not be him, so please, you know, just be careful about that. And the actual statements from Detective Hochbegin are considerably less forceful in the testimony than the government I think recalls. But that is a fig leaf. And at some point you have to say, no, a fig leaf is not enough. And so you have to say, okay, are we going to give up saying that show-ups are not a problem because every time we look for some excuse to say, well, maybe it's reliable because there's other evidence, so we're going to continue to allow it? Or are you going to say, no, this is suggestive and there are issues about reliability of that here, particularly, again, where you have the police saying, you know, beyond the reasonable count case, when 12 people say that's not the person, I can't identify them, and two, one says, well, it looks like him, and the other is completely inconsistent. If you were trying this case just on that identification evidence, Mr. Ivey would have walked out of that courtroom. He was not convicted in the state court. It was a hung jury, which is why we wound up in federal court in the first place. So there's actual tangible evidence here that but for some of these issues, the result in the trial would have been different. Thank you. Thank you, Mr. McLaughlin. Thank you, Ms. Ray and Ms. McLaughlin. I note that you're a court opponent, and on behalf of the Fourth Circuit, I want to thank you so much for doing this. Our court relies on lawyers like yourself who take these cases, and it's very important. I want to thank you very much. And, of course, Ms. Amy Ray, we thank you for your able representation of the United States. And, counsel, I hope you don't mind this, but you can't come down and shake your hand and greet you, but if I could, I would add one addition, so I'll let you hear what I would say to Ms. Ray, and that is it has nothing to do with this case. Congratulations on your ‑‑ that's very nice. I read that she's taking on her civic responsibility in terms of schools in her town, and she's on the board, and thank you for that service, and congratulations on your win. Counsel, that ‑‑ all right. Thank you so much. We'll go to our last case. Thank you.
judges: Roger L. Gregory, Stephanie D. Thacker, Allison J. Rushing